## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01712

**JASON TERLIZZI** and **REBECCA TERLIZZI**, individually and on behalf of all others similarly situated,

       Plaintiffs,

v.

**ALTITUDE MARKETING, INC**, d/b/a 1 800 Solar USA, a Colorado corporation, and **GREENSKY, LLC**, a Georgia limited liability company,

       Defendants.

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiffs Jason and Rebecca Terlizzi bring this Class Action Complaint and Demand for Jury Trial against Defendants Altitude Marketing, Inc, d/b/a 1800 Solar USA, and GreenSky, LLC, for generating unlicensed and predatory consumer loans through deceptive in-home sales of defective products. Plaintiffs, for their Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.     This case concerns the Colorado arm of a national loan-generation scheme. Defendant GreenSky uses merchants around the nation to push consumers into buying expensive

"home improvement" products, such as "zero-cost" solar energy systems, through high-pressure in-home solicitations. GreenSky then brokers the high-interest, five-figure loans needed to complete these purchases, with virtually no questions asked.

2.     Through this scheme, GreenSky collects brokerage and servicing commissions, its merchants collect sales revenues, and the consumers are left holding defective goods and crushing debt. Defendants' victims include Plaintiffs, the Terlizzis, who—as a family with children and a limited income—are now saddled with more than $49,000 of debt and a solar energy system that does not work as promised. Hundreds of others have been similarly victimized.

3.     The Defendants in this case are not licensed to make these types of loans in Colorado (and GreenSky is not even registered to do business there at all). Yet they solicit and lend anyway, all while inducing sales through deception and unlawful contingent rebates, extending credit without providing loan documents, failing to make required cancellation disclosures, and charging extortionate interest rates exceeding the legal maximum.

4.     Due to these unlawful practices, Defendants' sales transactions and loan contracts are unenforceable, and the Terlizzis—along with two putative classes of similarly situated individuals (the "Classes," defined below)—are entitled to declaratory relief as well as statutory damages of three times the amount of the finance charges imposed upon them, together with costs and reasonable attorneys' fees.

**PARTIES**

5.     Plaintiff Jason Terlizzi is a natural person and resident of the State of Colorado.

6.     Plaintiff Rebecca Terlizzi is a natural person and resident of the State of

Colorado.

7.      Defendant Altitude Marketing, Inc, d/b/a AMI Energy Solutions, AC Solar

Solutions, Solar USA, and 1 800 Solar USA, is a corporation incorporated and existing under the

laws of the State of Colorado with its principal place of business located at 8671 Wolff Court,

Suite 300, Westminster, Colorado 80031. Defendant Altitude regularly conducts business

throughout this District, the State of Colorado, and the United States.

8.      Defendant GreenSky, LLC, is a limited liability company organized and existing

under the laws of the State of Georgia with its principal place of business located at 5565

Glenridge Connector, Suite 800, Atlanta, Georgia 30342. Defendant GreenSky regularly

conducts business throughout this District, the State of Colorado, and the United States.

### JURISDICTION AND VENUE

9.      Subject matter jurisdiction is proper in this Court pursuant to the Class Action

Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because (i) the proposed Classes consist of more

than 100 members; (ii) the parties are minimally diverse, since members of the proposed Classes,

including Plaintiffs, are citizens of a different state from one of Defendants' home states; (iii) the

aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs; and (iv)

during the 3-year period preceding the filing of this action, another class action was filed

asserting similar factual allegations against at least one of the Defendants.[1]

---

[1]      *See Davy et al.* v. *Duke Energy of the Carolinas, LLC, et al.*, Case No. 7:15-cv-04927-
MGL (D.S.C.) (November 12, 2015) (alleging against Defendant GreenSky that "all members of
the [South Carolina only] class were maliciously targeted to enter into wrongful and improper
agreements to purchase improper and fraudulent solar panel systems for residential purposes"
and that Plaintiffs "obtained a 'GreenSky Installment Loan'" for tens of thousands of dollars
despite having "not executed an agreement with GreenSky regarding the financing of the solar
system.")

10.     The Court has personal jurisdiction over Defendants because they conduct significant business transactions in this District and solicit business in this District. Moreover, Defendants caused the harms complained of herein from within this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants conduct significant business transactions in this District, solicit business in this District, and because a substantial part of the events giving rise to this action occurred in this District. Moreover, Plaintiffs reside in this District and suffered harm within this District.

## COMMON FACTUAL ALLEGATIONS

### I.     Colorado Consumers Expect Protection from Unfair Practices

12.     The Terlizzis, like all Colorado residents, are entitled to the protections of a number of Colorado laws and regulations that serve to promote fair business practices and honest dealings. They also generally expect that any business that visits their home will subject itself to Colorado's laws, abide by Colorado's rules, and conduct itself with a certain measure of integrity and accountability.

13.     By way of example, Colorado's Uniform Consumer Credit Code ("UCCC")[2] protects "consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit."[3] Among other things, the UCCC protects consumers by requiring high-interest lenders—a class of lenders inherently at a higher risk for consumer abuse—to acquire special licensing before making loans. Loans with interest rates above 12% are even defined as "supervised loans" precisely because, at that rate of interest, they cannot be lawfully made without the supervision of the State. Unlicensed lenders, in turn, "shall not engage in the

---

[2]     Colo. Rev. Stat. Ann. §§ 5-1-101 *et seq*.
[3]     *Id*. § 5-1-102(2)(d).

business of making supervised loans."[4]

14.     This licensing process helps Colorado ensure "that the financial responsibility, character, and fitness of the applicant and of the members, managers, partners, officers, and directors thereof are such as to warrant belief that the business will be operated honestly and fairly within the purposes of this code."[5] Presumably, dishonest and unfair companies will be unable to obtain or maintain licensing and will, therefore, not be allowed to extend high-interest consumer loans in the State.

15.     But Defendant GreenSky, along with merchants like Defendant Altitude, do not abide by these laws and do not subject themselves to the supervision of the State. Instead, they flout both the letter and spirit of Colorado law while taking advantage of the very consumer trust such laws serve to engender.

**II.     GreenSky's Home Solicitation & Loan Generation Schemes**

16.     For many years, GreenSky has flouted consumer protection laws around the country, including the UCCC, to run its home-solicitation and loan-generation schemes. From state to state, these schemes look the same: GreenSky partners with local merchants who call on consumers at home, using high-pressure and deceptive techniques to sell expensive products— such as supposed "zero-cost" solar energy systems—that do not work as promised. As part of each sale, GreenSky brokers and services the unaffordable "bridge" loans needed to buy the products. Consumers accept these loans based on false promises of rebates, introductory rates, and refinancing opportunities that, by and large, are not actually available to them. Ultimately, GreenSky pockets the brokerage and servicing fees for these loans while passing the actual credit

---

[4]     *Id*. § 5-2-301(1)(a).
[5]     *Id*. § 5-2-302(2).

risk along to other entities.

17.     In just this past year, GreenSky has been sued for this misconduct in at least three separate actions brought in the states of Oregon, California, and South Carolina. In each case, GreenSky allegedly made, without appropriate investigation, unlawful five-digit loans to consumers for defective "zero-cost" solar energy systems pushed by GreenSky's merchants.[6]

18.     In the process, GreenSky routinely provides consumers with $25,000+ loans— with annual interest rates in excess of 17%—with literally no questions asked. GreenSky, by design, is delinquent in its oversight of the loan process: it does not confirm that the consumers actually receive copies of the loan documents, does not adequately consider each consumer's ability to repay, and does not adequately ensure that these consumers have even agreed to take out the loans in the first place.

19.     Consumer complaints against GreenSky for these practices are scathing and too numerous to quote in full. Nonetheless, consumers consistently tell the same story: an unscrupulous home solicitor sells them a bill of goods, and GreenSky enables the purchase by issuing predatory (and even unexpected) loans, often without prior disclosure of the loan documents or, in some cases, prior authorization at all:

---

[6]     *See*, *e.g.*, *Davy et al. v. Duke Energy of the Carolinas, LLC, et al.*, Case No. 7:15-cv-04927-MGL (D.S.C.) (November 12, 2015) (alleging, in a class action on behalf of all South Carolina residents, that GreenSky funded—without authorization—$25,000+ purchases of defective solar energy systems sold by its merchant "Energy Conservation Solutions, Inc."); *Thompson v. A1 Solar Power, Inc.*, *et al.* Case No. RG15777034 (Cal. Super. Ct. July 08, 2015) (alleging that GreenSky acted as the "complicit lender" that "wrongfully procured a loan" for a solar energy system sold by merchants "Energy Enterprises USA, Inc." and "A1 Solar Power, Inc."); *Martin v. One Energy of Utah, LLC et al.*, Case No. 3:16-cv-00383 (D. Or. Feb 29, 2016) (alleging GreenSky procured the "illegal debt" issued to "an Oregon homeowner who was fraudulently convinced to sign an agreement to purchase solar equipment from defendant One Energy.").

- "Greensky funded a loan for Solar installation. . . . We had not and still have not approved, signed or authorized any loan documents with GreenSky. GreenSky funded the loan and made the full payment of the amount of the loan prior to the completion of the installation. After the fact, GreenSky sent us unsigned loan documents (for the wrong amount)."[7]

- "Greensky is literally funding a Ponzi Scheme in Florida called Energy Solutions of Florida /Renuen Corporation."[8]

- "GreenSky Financial is trying to collect a debt that I never agreed to, and that I cancelled within three days, and is ruining my credit. A salesman from [redacted] came to my door to sell me solar panels. He told me a bunch of information that turned out to be false, including about whether the solar panels would save me money. The salesman told me the panels would power my house, but [redacted] told me later the panels were not sufficient to power my house. I never signed a loan agreement, but in [redacted] 2013 I received loan documents from Greensky Financial claiming I owed $17000.00. They sent a loan agreement without my signature, and I never signed any agreement."[9]

- "I feel I am a victim of a scam. A man, [redacted], of [redacted] stopped by my home stating he wanted to put vinyl siding on my house to make it look better. I told him I could not afford it. . . . . Note: My home didn't need vinyl siding to protect it as it was covered with slate shingles that will be here forever. Next thing I know I receive a loan statement from Green Sky. . . . I had not asked for credit, filled out an application or signed a contract of any kind, signed or agreed to anything with [redacted], Green Sky, or [redacted] Bank."[10]

- "A loan was taken out in my name. I was sent a letter saying I had taken out the loan when I had not. . . . I disputed this in writing, filed a police report, put a fraud alert with the credit agencies. The company is Greensky Loan Services. Located

---

[7]     Better Business Bureau, *GreenSky Trade Credit in Atlanta Georgia*, available at http://www.bbb.org/atlanta/business-reviews/loan-servicing/greensky-trade-credit-in-atlanta-ga-27259210/complaints (last accessed July 5, 2016).

[8]     Scam.com, *GreenSky is Literally Funding a Ponzi Scheme*, available at http://www.scam.com/showthread.php?622376-Greensky-is-literally-funding-a-Ponzi-Scheme (last accessed July 5, 2016).

[9]     Bad Finance, *GreenSky Trade Credit LLC*, available at http://badfinance.org/review/1627387/greensky-trade-credit-llc-consumer-loan (last accessed July 5, 2016).

[10]     Bad Finance, *GreenSky LLC*, available at http://badfinance.org/review/1480941/greensky-trade-credit-llc-debt-collection (last accessed July 5, 2016).

in [redacted], GA."[11]

- "I made a deal with a company called enegen purchasing home energy efficient product who called a loan company called green sky over the phone and agreed to making a payment around 70 dollars a month no dealer or loan documents at my disposal just a verbal agreement. No product warranty info and no loan documents. After five months I was notified I was under a promotional window with green sky and my payments would be going up. I did not agree to this terms nor was I aware of this if I was I would not have agreed to it."[12]

- "Greensky established a loan account in my name with information obtained from a third party. I NEVER signed ANY FINANCING contract with ANYONE."[13]

### III.     GreenSky and Altitude Routinely Deceive Colorado Residents

20.     GreenSky does not operate alone. Everywhere it goes, it relies on local partners to actually go from door to door, making the sales that serve as the impetus for its loans. In Colorado, one of GreenSky's partners is Defendant Altitude. As with all its merchants, GreenSky specifically vetted Altitude, and the owners thereof, through its merchant application process, and has trained and authorized Altitude employees to act as its agents for making consumer loans. GreenSky routinely accepts, brokers, and services these loans, for profit.

21.     Defendant Altitude, for its part, operates by visiting the homes of potential victims and using bogus, high-pressure sales tactics to induce rushed purchases of "zero-cost" solar energy systems. It uses deceptive and psychological manipulation techniques to intensify sales pressures, such as pretending to impose extreme time and quantity limitations on its "special" offers.

---

[11]     Bad Finance, GreenSky Trade Credit LLC, available at http://badfinance.org/review/1742433/greensky-trade-credit-llc-consumer-loan (last accessed July 5, 2016).
[12]     Better Business Bureau, *GreenSky Trade Credit in Atlanta Georgia*, available at http://www.bbb.org/atlanta/business-reviews/loan-servicing/greensky-trade-credit-in-atlanta-ga-27259210/complaints (last accessed July 5, 2016).
[13]     *Id.*

22.     For example, Altitude falsely claims that its "zero-cost" solar energy packages are of extremely limited availability and will only be sold to the first two purchasers in any given area, even though these packages cost tens of thousands of dollars and Altitude sells as many as it can, without limit.

23.     Altitude also falsely tells all prospective consumers that they "qualify for special rebates and pricing," but it makes the same rebates and pricing available to everyone everywhere. *See*, *e.g.*, Figures 1-3 (showing Altitude's "1800solarusa.net" website, where any consumer, at any zip code, will "qualify" for the "special rebates and pricing.").



Figure 1.



Figure 2.



Figure 3.

24.     Moreover, Altitude's rebates are actually contingent and are often unavailable to consumers. The main "special rebate" that it pitches is actually a 30% federal tax "credit" which—despites Altitude's guarantees to the contrary—can only be fully claimed by individuals with taxable income levels above what most consumers actually earn. Nonetheless, Altitude promises *all* consumers that they will receive this "tax credit" as a dollar-for-dollar "tax rebate" check in the current tax year, without even inquiring as to their income levels. Most do not

qualify to claim it in full. Moreover, tax credits, by their very nature, make for inappropriate rebates, as they are contingent upon the occurrence of events subsequent to a sale—specifically, future income levels and tax liabilities.

25.     Altitude also promises a number of other rebates that are contingent upon post-transaction events, such as rebates premised upon:

- Producing three referrals who "must be home owners and need windows, siding, roofing, sunroom, or solar" (without regard to a consumer's capacity to find and identify such individuals);

- Allowing a "1-800-Solar-USA yard sign during installation and 30 days following completion date" (without regard to local signage ordinances);

- Writing "a letter of recommendation at the end of completion describing the experience and initial savings & comfort" (without regard to whether or not any future savings or comfort will come to exist);

- Agreeing "to be an active reference for 1-800-Solar-USA" (without regard to the actual future state of customer satisfaction); and

- Submitting "all current energy bills" "postmarked no later than the 15th day of each month for 12 consecutive months" (without regard to whether or not each energy bill will even be available by the 15th of each month).

26.     Altitude further claims—again falsely—that these contingent rebates and energy savings will combine to result in zero-cost (or negative-cost) solar energy systems, netting lower overall monthly payments while adding equity to the home.

27.     Ultimately, Altitude uses these false statements, the extreme sense of urgency created by its artificial time and quantity limitations, and the lure of attractive but contingent (and likely unavailable) rebates to induce consumers to make same-day purchases of solar energy systems at prices often exceeding $40,000.

28.     But Altitude does not expect its target consumers to have $40,000 readily

available. This, of course, provides the opening for Defendants to arrange financing through GreenSky.

29.     Defendants do not leave this financing opportunity to chance. Rather, to ensure that GreenSky gets all the business, Altitude's standard-form purchase agreements require all purchasers in need of financing to "agree[] to apply for financing through [Altitude], and if approved; accept financing (the Loan) for the balance of the Purchase Price." During this financing process, Altitude funnels the loan opportunities to GreenSky, interacting directly with it and serving as its consumer-facing agent to act on its behalf.

30.     To "apply for financing," in the sense used by Defendants, consumers need only sign three one-page documents, two of which contain blank spaces *that Defendants fill in later.* Later on, Defendants ultimately consummate the loans, and credit is actually extended, upon the electronic receipt and signing of just two more one-page documents.

31.     Notably, at the time of transacting, consumers are not made aware of any other loan documents or loan terms, nor are they told to expect any such documents, even though more documents are subsequently mailed to them (only to be received after the transaction is already complete and the three-day cancellation window is closed). Without close inspection, these mailed documents look like mere copies of the previously signed electronic ones, and consumers are not given any notice that the mailed documents may contain new, additional, and material conditions that were not included with the electronic versions. Obviously, since consumers do not receive copies of any of these mailed terms before credit is actually extended, they cannot have given their prior assent to be bound by them.

32.     As a result of Defendants' practices, consumers assume tens of thousands of

dollars of purported debt through unenforceable "contracts"—both Altitude's own and those issued by Defendant GreenSky—that violate numerous provisions of Colorado law.

33.    Among other things, and in addition to being induced by deception and the unlawful use of contingent rebates, these "contracts":

- Fail to include the notice of cancellation forms required for home solicitations;

- Unlawfully purport to allow the seller to retain 40% of the purchase price even if a sale is cancelled;

- Fail to disclose the full terms of financing before credit is extended, thus violating the law and denying any possibility of mutual assent; and

- Issue from companies that lack Colorado supervised lender licenses.

34.    As with GreenSky, consumer complaints against Defendant Altitude for these sales practices are legion, but a window into its illegal practices—and the widespread anger of victimized homeowners—becomes immediately evident from researching any of its various trade names, such as: "Altitude Marketing," "AMI Energy Solutions," "AC Solar Solutions," "A/C Solar Solutions," "Solar USA," and "1 800 Solar USA."

35.    By way of illustration, a review from July 28, 2013, shows Defendant Altitude using its false and misleading high-pressure home solicitation tactics:[14]

"[T]here was a component of 'hey we only look to have one study home in a given area and if you don't make up your mind in the next 2 days and we get a call from someone else in the area then you will lose out... We are offering you all of this free stuff...' "

36.    While that particular reviewer didn't follow through with the deal, the consumer below did, only to learn—like Plaintiffs and hundreds of others Colorado residents—that

---

[14]    Yelp, *AC Solar Solutions*, available at http://www.yelp.com/biz/ac-solar-solutions-lakeway-2 (last accessed July 5, 2016).

Defendant Altitude's promised "tax rebate" was not a rebate at all:[15]

> "We bought a 52 panel system which cost $66,500.00. We were concerned about
> financing and called several times before installation to verify the 30% Rebate
> check from the Federal Government that we were promised we would get, when
> we filed our taxes this year. It was supposed to be for $19,950.00.
>
> When we spoke with our CPA, when we got our taxes done, and asked about the
> 'rebate,' he laughed and said there was no such thing. . . .
>
> There is no way we will ever re-coop the money, they promised we would get in a
> single check when we filed our taxes. I'm just so tired of the broken promises and
> lies. . . . I've lost countless hours of sleep worrying about what might happen if
> the owner does not keep his word. They admitted to us that they lied originally.
> We are arranging financing for the amount we were supposed to have to pay. But
> the other approx. $22,000.00?
>
> Tired, disappointed, devastated. I don't know how they sleep at night. I don't sleep
> much anymore. The word, shysters, comes to mind."

37.    Additional reviews of Defendant Altitude are littered with words like "sketchy,"

"underhanded," "trick," "bizarre," "shady," "terrible," "cheat," "lie," and "con." *Id.* These

sentiments are further echoed in the numerous complaints filed against Defendant Altitude with

the Better Business Bureau, which include:[16]

- "This is the worst experience I have ever had with a company in my life. . . .
  [T]hey want us to pay the price we agreed to for 30-40 panels but only 18 were
  delivered and installed. Just to be clear, the system was sold to us with the
  promise that we would not have any more electric bills. . . . Steer well clear of this
  group, they have employed the most unscrupulous business practices I have ever
  seen including a strikingly clear example of bait and switch."

- "Altitude marketing under the 1800SolarUSA name breached their own legal
  contract. . . . I received no financial loan agreement paperwork since the signing.
  It was not until Sept. 2015 that the loan documentation arrived, with a change in

---

[15]    *Id.*
[16]    Better Business Bureau, Altitude Marketing, available at
http://www.bbb.org/denver/business-reviews/solar-energy-equipment-and-systems-
dealers/altitude-marketing-inc-in-westminster-co-90151837/customer-reviews#breakdown (last
accessed July 5, 2016).

terms of the contract that I signed. I signed for a 18 month no payment same as cash contract. They provided a 12 month no payment same as cash loan document after."

- "I had three bids but AMI Energy Solutions sold me on what turned out to be ****. They said ide see 12 months of energy bill savings, a hefty tax credit, that the solar panels would cover my bill each month, and after 12 months ide have a $100 payment and no electricty bill, a credit for the submission of my electricty bills after twelve months, and a two hundred dollar credit for the submission for the copies of my two other bid. All of it was lies."

- "Installed solar panels in August 2013, as of Feb. 2014, still not producing any power. Repeated calls to AC Solar, left messages, no responses. Is this business a scam. I have paid them in full(15,000)."

- "I was misinformed about many aspects of purchasing these panels. The most important being they would eliminate my electric bill, and they have not. This was a high pressure sale. I was promised many things that are inaccurate. This company was/is completely unprofessional and misleading. They promised that the panels would eliminate my electricity bill and the payments on the loans when they come due would be lower than any electric bill I've paid. I've notified them of many concerns and their response was either none or sarcastic. Now I'm paying for product that is of no use to me and will cause me thousands of dollars in the future."

38.     Again and again, consumers tell the same story: Defendant Altitude pressures consumers with a "limited availability" offer of a solar energy system (but actually sells to anybody that will say "yes"); guarantees all consumers that they qualify for large tax rebates as well as other rebates (most of which are contingent upon future events, and all of which are actually credits); tells consumers they will no longer have electricity bills (but the bills remain); and promises that the net cost of each system will be $0 or less (but consumers end up on the hook for hundreds or even thousands of dollars in monthly debt payments).

### FACTS SPECIFIC TO THE TERLIZZIS

39.     The Terlizzis own and live in a residential house located in Colorado.

40.     On June 30, 2015, the Terlizzis were visited at their home by one of Defendant

Altitude's "Energy Consultants," who wanted to sell them a solar energy package for their personal household use.

41.     To induce their purchase, Altitude—using its tried-and-true sales script—assured the Terlizzis that they could pay less to own one of its solar energy systems than they already paid to live without one.

42.     Specifically, before Altitude's visit, the Terlizzis paid as much as $160 per month in electricity costs. But Altitude guaranteed that its solar energy systems would be designed, based on the prior twelve months of electricity bills, to produce at least 110% of their monthly energy consumption, more than completely eliminating these existing monthly payments. This was not a qualified representation—Altitude specifically promised that this 110% design was guaranteed, and would account for the panels naturally decreasing in performance over time, so that in ten years they would at least still be producing 100% of the Terlizzis' energy needs.

43.     Altitude further promised that the Terlizzis would—without question—be entitled to a full dollar-for-dollar tax "rebate" of $13,141, and that they also qualified for a variety of other rebates, all of which would be received in time to pay down and refinance a special "no-interest no-payments" one-year bridge loan.

44.     Altitude further promised the Terlizzis that so long as they maintained their same credit scores, applied all of their rebates to the balance of the bridge loan, and replaced their existing electricity bills with twelve monthly $148 principal payments, they would be able to refinance the entire purchase price after a year's time and pay only $121 per month.

45.     Altitude further promised that the Terlizzis would see an additional $14 reduction to their monthly gas bills due to promotional additions like weather stripping and attic insulation.

46.     As a result, Altitude promised the Terlizzis that their total net payments, after a year's time, would be $107 per month—a significant monthly savings over their existing bills, with no additional out-of-pocket costs.

47.     In support of these promises, Altitude gave the Terlizzis the financial breakdown shown in <u>Figure 4</u>, below.



<u>Figure 4</u>.

48.     Altitude further presented this solar energy package as a special, limited-time deal. It told the Terlizzis that it would only provide two of these special packages within their entire area (and that the first was already done). Altitude insisted that the Terlizzis needed to claim their opportunity right away or they would miss out. Altitude also assured the Terlizzis that they could decide to lock in Defendant Altitude's offer right away and still have three days to change their minds before anything was finalized.

49.     Altitude did not tell the Terlizzis that virtually all of its claims were false.

Specifically, it did not tell them, and they did not know, that:

- The "deal" was not limited in time and would be offered to anyone willing to sign up;

- Their electricity bill would not be eliminated;

- Their $13,141 tax "rebate" would actually be a tax "credit," and they would only qualify to receive a small fraction of it;

- Their other potential rebates were subject to contingencies;

- Their gas bills would not be reduced by $14 per month;

- Their deferred interest loan would actually accrue interest that would be added to the principal balance throughout the "no-interest no-payment" period;

- Their actual interest rate would be 17.99%;

- Their ability to refinance and attain the promised payment amounts of $121 per month was nonexistent, as opposed to guaranteed;

- Their actual monthly payments, instead of decreasing, would skyrocket from approximately $120 per month to approximately $1,200; or that

- Neither Altitude nor GreenSky were licensed by the State of Colorado to legally enter into these sorts of transactions.

50.     The Terlizzis, induced by Altitude's misrepresentations, and unaware of its

material omissions, agreed to purchase its solar energy package.

51.     To effectuate this purchase, Altitude provided the Terlizzis with a "Purchase

Agreement."

52.     This Purchase Agreement falsely stated that it included an "ATTACHED

NOTICE OF CANCELLATION FORM." No such form was attached to the Purchase

Agreement, nor was any such form ever provided or made available to the Terlizzis.

53.     This Purchase Agreement also specified that the entire "Purchase Price shall be paid" "by financing," and required the Terlizzis to "agree[] to apply for financing through [Altitude], and if approved; accept financing (the Loan) for the balance of the Purchase Price."

54.     To "apply for financing," Altitude had the Terlizzis sign two one-page documents issued by GreenSky and an additional one-page document issued by Altitude itself.

55.     Altitude had the Terlizzis sign the first GreenSky document, a "No Interest No Payment Obligation Agreement Borrower Payment Certificate," with the four date fields, three amount fields, and borrower account number fields all left blank. The Terlizzis eventually received, at different times, two copies of this same document showing *differing* dates and amounts that Defendants had inserted into the blank spaces *after* obtaining their signature. *C.f.* Figures 5-6, below (showing the differing dollar amounts and dates that Defendants inserted via computer after obtaining a signature on June 30, 2015.)



Figure 5 (with computer-entered dates and amounts inserted *after* signing).



Figure 6 (exact same form and signature, but new, different dates and amounts).

56.     Similarly, as with the Borrower Certificate, Defendants used computers to fill in the dates on the second one-page GreenSky document, entitled "Financing Your Energy Efficient Home Improvement Project with a GreenSky Loan," which the Terlizzis signed on June 30, 2015, and which Defendants altered later:



Figure 7.

57.     Finally, Altitude had the Terlizzis sign a "Stage Funding / Financing" agreement, which preemptively authorized loan distributions without even disclosing loan terms:



<u>Figure 8</u>.

58.     The two one-page GreenSky documents, which the Terlizzis signed on June 30, 2015, were the entire universe of GreenSky documents that the Terlizzis were shown[17] at the time they applied for the loan.

59.     At that time, the Terlizzis believed that those two GreenSky documents

---

[17]     The word "shown" is used, as opposed to "received," because Defendants did not actually leave any copies of these two documents with the Terlizzis.

constituted the "GreenSky Installment Loan Agreement" for the no-interest, no-payment bridge loan to which they were agreeing.

60.     The Terlizzis were surprised to receive, the next day, an electronic document containing two new pages of GreenSky documents.

61.     One of these indicated potential monthly payments of $1,134.52, an order of magnitude more than the Terlizzis' current monthly electricity payments and of what they were expecting to pay.

62.     Naturally, the Terlizzis balked:



Figure 9 (Email from the Terlizzis to Defendant Altitude).

63.     Defendant Altitude attempted to hedge by saying that "[a]s long as your credit stays the same, you/we will have no problem helping you get refinanced at a payment that offsets your utility bill."

64.     The Terlizzis cancelled the purchase anyway *See* Figure 10, below.



Figure 10.

65.     But after the Terlizzis cancelled the sale, Defendant Altitude claimed to have

"confirmed with the bank" that the Terlizzis would be able to refinance in 12 months to a rate of

$121 per month, provided their credit score does not "dramatically change." *See* Figure 11,

below.

Figure 11.

66.     Induced by these representations, obtained in writing from the same representative of Defendant Altitude's finance department that was handling their GreenSky loan, the Terlizzis revoked their cancellation and accepted the solar energy system.

67.     Notably, however, even at this point in time, the Terlizzis had not signed any documents since July 1, 2015, and believed their transaction to be complete. Although they later received additional documents from GreenSky in the mail (after their transactions were already complete), these documents looked like mere copies of the previously signed ones, and did not provide any notice that they contained any new or different terms.

68.     Unfortunately, and despite *improving* their credit scores over the course of the year, the Terlizzis have not been able to—and by all accounts never could possibly have been able to—refinance at a monthly rate even close to the $121 per month amount that they had been promised.

69.     More specifically, as detailed in a letter that the Terlizzis sent to Defendant Altitude on March 30, 2016:

Dear Customer Relations

On July 1ˢᵗ, 2015 we bought a home solar system package consisting of 21 panels. We made this purchase agreement on June 30, 2015, in our home with your energy consultant, Marty Horn.

Unfortunately, we have not received the performance, savings, increased home value or financing promised. Your energy consultant (Marty Horn) promised on June 30, 2015, that we would not have an electric bill as a result of the one-hundred ten percent (110%) output of the panels. We have continued to have an electric bill and have not seen the output of one-hundred ten percent (110%) as promised. On August 25, 2015, United Power evaluated the solar system and stated our system would produce ninety-six percent (96%) of our average usage. We were also promised that we would receive a dollar for dollar tax credit of thirty percent (30%) the total cost of the system, of thirteen thousand one hundred forty-one dollars ($13,141). The tax credit was not a dollar for dollar credit of thirty percent (30%), but instead, we received a federal refund for the solar of seven hundred fifty dollars ($750). We were also promised that at the time of refinancing if Jason's credit score did not drop below seven hundred twenty (720) we would be able to refinance our loan for a monthly payment of one hundred twenty dollars ($121). Combined with gas savings of fourteen dollars ($14) a month (which we have not seen any gas savings), our monthly payment would be one hundred seven dollars ($107). After speaking with both of your refinancing institutes (Key Bank and BBVA Compass, referred by your finance department), they informed us that the refinance amount and payment promised to us was not achievable. Marty Horn quoted the final savings amount after savings, credits and rebates would be twenty-five thousand four hundred thirty-three dollars ($25,433). Yuri Heredia at BBVA Compass stated that a loan in the amount of six thousand one hundred dollars ($6100) would result in a payment of one hundred and six dollars and ninety-two cents ($106.92). Jim Levenduski at Key Bank stated that a twenty-five thousand dollar ($25,000) loan would not be possible to refinance. Jim also stated that even a fifteen thousand dollars ($15,000) loan would result in a payment of one hundred sixty thousand dollars ($160), a payment below that amount is not possible.

Figure 12.

70.     In other words, the Terlizzis are now trapped into a high-interest loan arrangement with GreenSky that is set to balloon, requiring payments *in excess $1,100 per month* for a solar energy system that does not even fully cover their existing energy costs.

71.     To date, Defendants have refused to right these wrongs, and the Terlizzis—as they promised in their March 2016 letter—have now "engaged third-party assistance in pursuit of a claim," on behalf of themselves as well as all other similarly situated.

## CLASS ALLEGATIONS

72.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2)

and 23(b)(3) on behalf of themselves and two classes of similarly situated individuals (the

"Classes"), defined as follows:

> **GreenSky Class**: All Colorado residents who incurred a consumer loan
> for less than $75,000 that was financed through Defendant GreenSky at an
> annual interest rate exceeding 12% per year.

> **Altitude Subclass**: All members of the GreenSky Class who purchased a
> solar energy system through Defendant Altitude.

The following persons are excluded from the Classes: (1) any Judge or Magistrate presiding over

this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents,

successors, predecessors, and any entity in which the Defendants or their parents have a

controlling interest and their current or former employees, officers and directors; (3) persons who

properly execute and file a timely request for exclusion from the Classes; (4) persons who have

had their claims in this matter finally adjudicated and/or otherwise released; (5) the legal

representatives, successors, or assigns of any such excluded persons; and (6) Plaintiffs' counsel

and Defendants' counsel.

73.     **Numerosity**: The exact sizes of the Classes are unknown and not available to

Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and

belief, Defendants have sold and financed solar energy systems to hundreds of Colorado

residents that fall into the definitions of each of the Classes. Members of the Classes can be

readily and specifically identified through Defendants' own records.

74.     **Commonality and Predominance**: There are many questions of law and fact

common to the claims of Plaintiffs and the Classes, and those questions predominate over any

questions that may affect individual members of the Classes. Common and predominant questions for the Classes include, but are not necessarily limited to, the following:

> (a)     Whether Defendants made supervised loans to Colorado residents without having supervised lender licenses;
>
> (b)     Whether Defendants induced Colorado residents to assume supervised loans through contingent rebates and/or through unconscionable conduct;
>
> (c)     Whether Defendants provided the prefilled notice of cancellation forms required for home solicitations in the State of Colorado;
>
> (d)     Whether Defendants provided full written agreements of the loan terms before extending credit; and
>
> (e)     Whether the members of the Classes are entitled to statutory damages, costs, attorneys' fees, and declaratory relief as a result of the misconduct alleged herein.

75.     **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

76.     **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.

77.     **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to

the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes, and making final injunctive and declaratory relief appropriate with respect to the Classes as a whole. Defendants' policies and practices as challenged herein apply and affect members of the Classes uniformly and Plaintiffs' challenge of these policies and practices hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Classes. The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Classes are the same, resulting in injury to the Plaintiffs and to all of the other members of the Classes. Plaintiffs and the members of the Classes have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

78.     **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and because joinder of all parties is impracticable. Individual litigation is not preferable to a class action because it would increase the delay and expense to all parties due to the complex—but common—legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Violations of the UCCC**
**Colo. Rev. Stat. Ann. § 5-5-201(1)**
**(On behalf of Plaintiffs and the Classes)**

79.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

80.     Plaintiffs and the members of the Classes are buyers and debtors to whom credit was granted in an amount less than $75,000 and at an annual interest rate in excess of 12% in order to purchase goods or services for their personal household use. As such, Plaintiffs and the members of the Classes are "Consumers" who received "Supervised loans" in "Consumer credit transactions" as those terms are understood pursuant to the UCCC. Colo. Rev. Stat. Ann. § 5-1-301(10), (12), (47).

81.     Defendants are sellers or lenders or are persons who make or arrange consumer credit transactions having annual interest rates in excess of 12% and to whom such transactions are initially payable. As such, Defendants are "Creditors" engaged in the business of making and/or collecting on "Supervised loans" as those terms are understood pursuant to the UCCC. Colo. Rev. Stat. Ann. § 5-1-301(17), (47).

82.     Defendants do not have Colorado supervised lender licenses and are not authorized to receive deposits or maintain deposit accounts. As such, Defendants are not "Supervised financial organizations" or "Supervised lenders" as those terms are understood pursuant to the UCCC. Colo. Rev. Stat. Ann. § 5-1-301(45), (46).

83.     The UCCC states that "[u]nless a person is a supervised financial organization or has first obtained a license from the administrator authorizing him or her to make supervised loans, he or she shall not engage in the business of: (a) Making supervised loans or undertaking direct collection of payments from or enforcement of rights against consumers arising from

28

supervised loans he or she has previously made." Colo. Rev. Stat. Ann. § 5-2-301(1).

84.     Defendants, without being supervised financial organizations or supervised lenders, engaged in the business of making and/or undertaking collections of supervised loans issued to Plaintiffs and the members of the Classes. As such, Defendants "violated the provisions of" the UCCC applying to their "authority to make supervised loans." Colo. Rev. Stat. Ann. § 5-5-201(1).

85.     Defendants' violations have proximately harmed Plaintiffs and the members of the Classes by subjecting them to liability for unlawful and unenforceable debts and by inducing them to make payments on such debts.

86.     As a result of Defendants' violations, Plaintiffs and the members of the Classes are entitled to recover penalties of up to "three times the amount of the finance charge" as well as "reasonable attorney fees." Colo. Rev. Stat. Ann. § 5-5-201(1), (7).

## SECOND CAUSE OF ACTION
### Declaratory Judgment
### Colo. Rev. Stat. Ann. §§ 13-51-101 *et seq*.
### (On behalf of Plaintiffs and the Classes)

87.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

88.     Plaintiffs and the members of the Classes are "Persons" "whose rights, status, or other legal relations are affected by a statute" and who "may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder" pursuant to the Colorado Uniform Declaratory Judgment Act, Colo. Rev. Stat. Ann. §§ 13-51-101 *et seq*. Colo. Rev. Stat. Ann. §§ 13-51-103, 13-51-106.

89.     Specifically, Plaintiffs and the members of the Classes are subject to actual

controversies and uncertainties concerning their consumer purchases and consumer loans, including the validity of such loans, their obligations to make payments under such loans, their rights to cancel or alter such loans, and the ownership status of any property they have purchased pursuant to such loans. These controversies and uncertainties present tangible detriments to conduct or activities that are presently occurring or that are to be occurring in the near future, and they reflect actual, present, and existing disputes between parties having genuine and opposing interests.

90.     For example, Defendant GreenSky will soon require the Terlizzis, as of July 15, 2016, to begin paying over $1,100 per month for a loan that it treats as enforceable. The Terlizzis, in turn, believe that this loan is not enforceable under Colorado law. The Terlizzis will be harmed if they are forced to pay on an unenforceable loan, whereas GreenSky will be harmed if it cannot collect on an enforceable loan. The question of whether or not the loan is enforceable depends entirely on how the UCCC is applied under Colorado law, and a judicial determination of this question will have a direct, substantial, and conclusive impact on the rights and future conduct of the parties. Moreover, any such determination would apply uniformly to all members of the Classes, against whom GreenSky either currently is or soon will be imposing similar liabilities based on the same standard-form loan terms.

91.     Consequently, Plaintiffs and the Classes seek declaratory judgments that:

• Defendants' loans are unenforceable because they were all made without first procuring the necessary supervised lender licenses, and any "contract entered into by an unlicensed person in contravention of the statutory provisions of this kind will not be enforced," "[v]alid contracts may not arise out of transactions forbidden by law," and "[t]he illegality inhering at the inception of such contracts taints them throughout and effectually bars enforcement," *Waggener v. Holt Chew Motor Co.*, 130 Colo. 294, 300-01, 274 P.2d 968, 971 (1954);

- Defendants' loans are unenforceable because they were issued in contravention of state and federal law and thus may be considered "unconscionable at the time [they were] made," Colo. Rev. Stat. Ann. § 5-5-109(1)(a);

- The loan debts of Plaintiffs and the Altitude Subclass are invalid and unenforceable because they were all extended without first providing a full written agreement and copy of the loan terms, and "[n]o consumer credit transaction shall be valid or enforceable in this state unless its terms are contained in a written agreement and a copy is provided to the consumer at or before the time credit is extended," Colo. Rev. Stat. Ann. § 5-3-108;

- Plaintiffs and the Altitude Subclass members have the right to cancel their solar energy system purchases because Defendant Altitude sold each of these systems through home solicitations without providing the required prefilled cancellation forms, and "[u]ntil the seller has complied with this section [by providing such forms], the buyer may cancel the home solicitation sale by notifying the seller in any manner and by any means of the buyer's intention to cancel," Colo. Rev. Stat. Ann. § 5-3-403(3); and

- Plaintiffs and the Altitude Subclass members can "retain the goods delivered and the benefit of any services performed without any obligation to pay for them" because each of their purchases were induced by rebates "contingent upon the occurrence of an event subsequent to the time the consumer agrees to buy" such goods, Colo. Rev. Stat. Ann. § 5-3-209.

92.     By issuing the above-requested judgments, this Court would terminate actual and ripe controversies between adverse parties and would resolve uncertainties that are of actual, direct, and substantial interest to Plaintiffs and the members of the Classes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Jason Terlizzi and Rebecca Terlizzi, individually and on behalf of the Classes, prays for the following relief:

A.     An order certifying the Classes as defined above, appointing Plaintiffs Jason Terlizzi and Rebecca Terlizzi as the representatives of the Classes, and appointing their counsel as Class Counsel;

B.     An award of actual and statutory damages;

C.      Declaratory relief;

D.      An award of reasonable attorneys' fees and costs; and

E.      Such other and further relief that the Court deems reasonable and just.

### JURY DEMAND

Plaintiffs requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**JASON TERLIZZI** and **REBECCA TERLIZZI**, individually and on behalf of all others similarly situated,

Dated: July 5, 2016                       By: /s/ Benjamin H. Richman
                                          One of Plaintiffs' Attorneys

Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Attorneys for Plaintiffs and the putative Classes*