# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge William J. Martínez

Civil Action No. 16-cv-1712-WJM-STV

JASON TERLIZZI and REBECCA TERLIZZI, individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

ALTITUDE MARKETING, INC., and
GREENSKY, LLC,

    Defendants.

---

## ORDER GRANTING MOTION TO COMPEL ARBITRATION

---

Plaintiffs Jason and Rebecca Terlizzi ("the Terlizzis") bring this putative class action against Defendants Altitude Marketing, Inc. ("Altitude"), and GreenSky, LLC ("GreenSky"), for claims related to Defendants' allegedly deceptive marketing and sale of high-interest financing for rooftop solar power systems. (ECF No. 1.) Currently before the Court is GreenSky's Motion to Dismiss or, in the Alternative, to Compel Arbitration and Stay Proceedings. (ECF No. 86.) Despite its title, this motion primarily addresses arbitration and, alternatively, dismissal for failure to state a claim. The Terlizzis respond that they never entered into an arbitration agreement and that their claims are sufficiently pleaded.

For the reasons stated below, the Court finds that an arbitration agreement exists between the Terlizzis and GreenSky, and that the arbitration agreement encompasses all of the disputes at issue here. Accordingly, under the Federal Arbitration Act ("FAA"),

9 U.S.C. §§ 1 *et seq.*, the Court must refer the parties to arbitration. GreenSky's motion will therefore be granted to that extent, and is otherwise denied without prejudice. The Court will stay proceedings between the Terlizzis and GreenSky, and the Terlizzis will be required to submit an appropriate filing regarding the current status of Altitude.

## I. CURRENT PROCEDURAL POSTURE

For clarification, the Court notes the following:

The Terlizzis filed this lawsuit in July 2016. (ECF No. 1.) GreenSky filed its Motion to Compel in August 2016. (ECF No. 13.) Altitude filed its own similar motion in September 2016. (ECF No. 23.) The Terlizzis filed a combined response to both motions in October 2016. (ECF No. 40.) Later than same month, GreenSky filed its reply brief (ECF No. 45), as did Altitude (ECF No. 46).

In February 2017 (before the Court had ruled on the pending motions), the parties filed a Joint Motion to Stay Pending Settlement Discussions. (ECF No. 56.) Rather than simply stay all deadlines, the Court administratively closed the case and ordered the parties to file a joint status report, dismissal papers, or a motion to reopen no later than June 12, 2017. (ECF No. 57.)

In April 2017, Altitude's counsel moved to withdraw. (ECF No. 58.) The Magistrate Judge granted that motion on May 5, 2017, and ordered Altitude to obtain new counsel by June 2, 2017. (ECF No. 61.) Altitude did not do so by that date, nor has it done so since.

On June 12, 2017, the Terlizzis and GreenSky filed a Joint Status Report requesting thirty additional days for settlement discussions. (ECF No. 65.) In that report, the Terlizzis and GreenSky announced their understanding that Altitude had filed

2

for bankruptcy and so the Terlizzis were no longer actively negotiating with Altitude. (*Id.* at 1 n.1.)[1]  No suggestion of bankruptcy has been filed, however.

The Court entered no order either approving or disapproving of the extra thirty days.  However, the Magistrate Judge held a status conference on August 23, 2017, and concluded that the case should remain administratively closed while the Terlizzis and GreenSky continue to pursue settlement.  (ECF No. 71.)

On September 26, 2017, the Terlizzis and GreenSky moved to reopen the case, announcing the failure of their settlement negotiations.  (ECF No. 74.)  The Court granted that motion.  (ECF No. 76.)  GreenSky then began filing notices of supplemental authority in support of its Motion to Compel, which it identified as ECF No. 23.  (*See* ECF Nos. 81–83.)  ECF No. 23 was, in fact, Altitude's motion, not GreenSky's.  In any event, the Court responded with the following text-only order (square-bracketed numerals indicate docket entries):

> This matter is before the Court on the Notices of Supplemental Authority filed by Defendant GreenSky, LLC [81], [82], [83], and the parties' Joint Status Report [84]. These filings reflect that GreenSky views its previously-filed Motion to Dismiss [23] as still pending.  However, under D.C.COLO.LCivR 41.2, "[r]eopening of a civil action does not reinstate any motion." Therefore Defendants' previously-filed motion is not presently pending as a motion ripe for decision by the Court.  GreenSky is therefore DIRECTED to re-file its motion to dismiss in the same form and content previously filed as a new docket entry.  The Court will review the previously-filed Response [40] and Reply [46] briefs without requiring re-filing.  To the extent GreenSky wishes the Court to consider authority not cited in its previously-filed motion, it should file a Motion for Leave pursuant to WJM Revised Practice Standards III.K.  These same directives shall apply

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in documents with prefatory material such as a table of contents.

3

> equally to Defendant Altitude Marketing, Inc., if and when it
> obtains new counsel to represent it in this action, although
> the Court notes that Altitude was previously ordered to
> obtain new counsel not later than June 2, 2017, but has not
> done so. (*See* ECF No. 61.) SO ORDERED[.]

(ECF No. 85.) This order should have identified GreenSky's Motion to Compel as ECF No. 13, rather than 23; and GreenSky's reply brief as ECF No. 45, not 46. This error flowed from GreenSky's misidentification of its own motion.

In any event, GreenSky refiled its own motion, as directed, and that is the motion currently before the Court. (ECF No. 86.) The Court has reviewed that motion as well as the Terlizzis' previously-filed response (ECF No. 40) and GreenSky's previously-filed reply (ECF No. 45). The Court has also considered the supplemental authority submitted by GreenSky at ECF No. 87-1.

## II. LEGAL STANDARD

According to FAA § 3:

> If any suit or proceeding be brought in any of the courts of
> the United States upon any issue referable to arbitration
> under an agreement in writing for such arbitration, the court
> in which such suit is pending, upon being satisfied that the
> issue involved in such suit or proceeding is referable to
> arbitration under such an agreement, shall on application of
> one of the parties stay the trial of the action until such
> arbitration has been had in accordance with the terms of the
> agreement, providing the applicant for the stay is not in
> default in proceeding with such arbitration.

9 U.S.C. § 3. Given the Terlizzis' claim that they never entered into an arbitration agreement, the question here is whether the Court is "satisfied that the issue[s] involved" in this dispute are "referable to arbitration."

"The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d

1279, 1287 (10th Cir. 1997). When a party raises a challenge to the existence of an arbitration agreement, this District has frequently treated such challenges as "governed by a standard similar to that governing motions for summary judgment." *Stein v. Burt-Kuni One, LLC*, 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005); s*ee also Goodwin v. H.M. Brown & Assocs., Inc.*, 2011 WL 820025, at *3 (D. Colo. Mar. 2, 2011) (citing cases following *Stein*). "Under this approach," it is said,

> the moving party bears the initial burden of presenting evidence sufficient to demonstrate than an enforceable arbitration agreement exists. If the moving party satisfies that burden, the burden then shifts to the party opposing arbitration, which must show that there is a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed.R.Civ.P. 56.

*Let's Go Aero, Inc. v. Cequent Performance Prod., Inc.*, 78 F. Supp. 3d 1363, 1373 (D. Colo. 2015) (citations and internal quotation marks omitted). If the opponent "demonstrates a genuine issue of material fact, then a trial on the existence of the arbitration agreement is required." *Stein*, 396 F. Supp. 2d at 1213 (citing, *inter alia*, 9 U.S.C. § 4).

The Terlizzis argue that the Court should apply the foregoing procedure (*see* ECF No. 40 at 12–13) and GreenSky's reply brief contains no counterargument (*see* ECF No. 45). GreenSky instead argues that the question of whether the parties entered into an arbitration agreement is something that the arbitration clause itself refers to an arbitrator. (*Id.* at 2–6.)

GreenSky is incorrect on this point. Although interpretation of the *scope* of an arbitration clause is a matter that the parties may delegate to an arbitrator, the threshold question of whether they entered *any* agreement to arbitrate is a matter for the Court.

5

*See, e.g.*, *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010) ("If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement . . . ."); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002) ("The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement.").

Because GreenSky does not challenge the Terlizzis' proffered procedure for resolving the question of whether an arbitration agreement exists, the Court therefore deems the Terlizzis' argument conceded and will apply this District's typical approach.[2]

### III. FACTS

The following facts are undisputed unless attributed to one party or another, or otherwise noted.

### A. The Terlizzis' Agreement to Purchase a Rooftop Solar System

On June 30, 2015, an "energy consultant" working for Altitude visited the Terlizzis at their home in Colorado and pitched to them a rooftop solar power system that would supposedly provide significant economic value at little cost to them, when considered in light of savings on utility bills, rebates, and refinancing—as long as they initially financed

---

[2] That said, the Court is frankly skeptical that the movant should bear the burden "to demonstrate than an *enforceable* arbitration agreement exists." *Let's Go Aero*, 78 F. Supp. 3d at 1373 (emphasis added); *see also Stein*, 396 F. Supp. 2d at 1213 (". . . Defendants must present evidence sufficient to demonstrate an enforceable arbitration agreement."). The word "enforceable" implies that the burden is on the movant to disprove possible defenses, such as unconscionability. *Cf. Strausberg v. Laurel Healthcare Providers, LLC*, 304 P.3d 409, 420 (N.M. 2013) ("the burden to prove the formation of a valid contract does not include the burden to prove the absence of unconscionability"). But the Court need not decide that issue here because the Terlizzis do not make any argument that GreenSky failed to meet its initial burden.

6

the project through a GreenSky bridge loan.  (ECF No. 40-1 ¶ 2; ECF No. 1 ¶¶ 53–55.)  Altitude's representative allegedly employed deceptive high-pressure sales tactics about special pricing that he represented to be time-sensitive and of limited availability.  (*Id.* ¶¶ 22–23, 48–49.)  In truth, Altitude would offer the same deal to anyone interested at any time.  (*Id.*)

The Terlizzis agreed on the spot to purchase the solar power system with GreenSky financing.  (ECF No. 40-1 ¶ 2.)  Jason Terlizzi signed four documents that day, but none contained in arbitration provision.  (*Id.* ¶¶ 3–6; ECF No. 40-3 to -6.)  One document, the "Borrower Payment Certificate," contained an acknowledgment that the signatory "agree[s] to be legally bound by the TERMS AND CONDITIONS" contained in "the GreenSky Installment Loan Agreement."  (ECF No. 40-4 at 2.)  As will become clear below, those Terms and Conditions contained an arbitration clause.  However, the Terlizzis claim they had not received the Installment Loan Agreement when Jason Terlizzi signed the Borrower Payment Certificate.  (ECF No. 40-1 ¶ 7.)

The GreenSky Installment Loan Agreement arrived by e-mail the following day, July 1, 2015.  (*Id.* ¶ 8.)  It announced approval for a $49,000 loan at 17.99% interest with no payments for the first twelve months and then eighty-four payments of $1,134.52 per month, for a total borrowing cost of $95,299.68.  (ECF No. 40-7 at 5.)  Above the signature block was a "Notice to Consumer" which contained the following warnings, among others:

- "DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT (INCLUDING ANY WRITING ON THE REVERSE SIDE) EVEN IF OTHERWISE ADVISED OR IF IT CONTAINS ANY BLANK SPACES."

7

- "THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM."
- "THE FIRST USE OF THE SHOPPING PASS [discussed below], PURCHASING CARD, OR THE ASSOCIATED INSTALLMENT LOAN TO MAKE A PURCHASE WILL CONSTITUTE ACCEPTANCE BY (ALL) BORROWER(S) OF THE TERMS OF THE ACCOMPANYING INSTALLMENT LOAN AGREEMENT . . . ."

(*Id.* (capitalization in original).) Then, below the signature block, in boldface, capitalized letters, the document announced that "terms and conditions continue on next page." (*Id.*)

According to the Terlizzis, there was no "next page." (ECF No. 40-1 ¶¶ 8–11.) But there was an additional document—the above-mentioned "Shopping Pass." (ECF No. 40-7 at 4.) The Shopping Pass purports to be something like a paper credit card. It announces, "When you are ready to make your purchase, give your Account Number and Expiration Date to your Merchant along with your photo ID. * * * You will have no obligation under this loan unless you authorize a transaction." (*Id.*)

Jason Terlizzi electronically signed the Installment Loan Agreement the same day he received it, July 1, 2015. (ECF No. 40-1 ¶ 12.) For the next two days, the Terlizzis entertained second thoughts due to "conflicting information about [their] expected refunds and expected monthly payments." (*Id.* ¶ 13.) The Terlizzis recognized that the monthly payment specified on the Installment Loan Agreement ($1,134.52) would be much higher than what they believed Altitude's sales

representative had promised ($107). (ECF No. 1 ¶¶ 61–62.)

In the early morning of July 3, Rebecca Terlizzi e-mailed Altitude announcing that she and Jason wished to cancel the transaction. (*Id.* ¶ 64.) Later that morning, an Altitude representative replied with reassurances about the net monthly cost to the Terlizzis through refinancing of GreenSky's loan, although the Altitude representative stated that the likely monthly payment would be $121, not $107. (*Id.* ¶ 65.) This e-mail sufficiently assuaged the Terlizzis' concerns, and they recommitted to the transaction that day. (ECF No. 40-1 ¶ 13.)

"Sometime later," say the Terlizzis, "we received an envelope in the mail that appeared to consist of unsigned copies of GreenSky documents that we had already signed electronically . . . ." (*Id.* ¶ 15.) According to GreenSky's records, the envelope in question was placed in the mail on July 1, 2015. (ECF No. 45-1 ¶ 2.) GreenSky argues that it is reasonable to presume that the mailing was received by July 6, 2015. (ECF No. 45 at 7–8.) In any event, the Terlizzis further assert that, "[u]nbeknownst to us, the envelope from GreenSky . . . also [contained] new terms"—*i.e.*, the Terms and Conditions—"that were not previously provided to us," including the arbitration clause at issue here. (ECF No. 40-1 ¶ 16.)

The Court will turn to the language of the arbitration clause momentarily. The Court first notes language from that mailing's cover letter:

> Although you have been approved for a GreenSky loan, you have no obligation until you authorize a transaction on your account. * * * Your loan agreement is included with this packet and contains the full terms and conditions of your loan. * * * Use of the Shopping Pass or the associated Installment Loan to make a purchase constitutes acceptance of the terms of the loan.

9

(ECF No. 40-8 at 2.)

**B.      The Arbitration Clause**

The arbitration clause in the Terms and Conditions begins as follows:

> This Arbitration Provision sets forth the circumstances and procedures underwhich [*sic*] Claims (defined below) that arise between you and us will be resolved through binding arbitration.  THIS MEANS THAT, UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION (AS PROVIDED BELOW) NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.  OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION.

(ECF No. 40-8 at 6, ¶ 24.)  The opt-out provision requires the borrower to send a letter to GreenSky's headquarters within 45 days.  (*Id.*)

The arbitration clause defines "Claim" to mean

> any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your GreenSky Installment Loan Agreement as well as the relationship resulting from such Agreement ("the Agreement"), including the validity, enforceability or scope of this Arbitration Provision or the Agreement.

(*Id.*)

The arbitration clause also contains a class action waiver: "Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others."  (*Id.*)

As for venue, fees, and similar matters, the arbitration clause states,

> The arbitration will take place in the federal judicial district where you live.  Regardless of who wins in arbitration, you

10

> will only be responsible for paying your share, if any, of the
> arbitration fees required by the applicable [arbitration rules],
> which amount will not exceed the filing fees that you would
> have incurred if the Claim had been brought in the
> appropriate state or federal court closest to where you live.
> We will pay the remainder of any arbitration fees.

(*Id.*)

**C.      Subsequent Events**

No later than September 12, 2015, the Terlizzis began drawing on the GreenSky loan. (*See* ECF No. 45-1 ¶ 8.) The Terlizzis do not claim that they opted out of the arbitration agreement.

The Terlizzis now have a rooftop solar power system but it has not produced the amount of power they claim they were promised, nor the promised savings, and they have not been able to refinance the GreenSky loan. (ECF No. 1 ¶¶ 68–70.)[3] The Terlizzis have sued Altitude and GreenSky in a purported class action encompassing themselves and all other Colorado residents who were allegedly misled by Altitude or GreenSky into financing a solar power system through GreenSky. (*Id.* ¶ 72.)

## IV. ANALYSIS

**A.      Whether an Agreement to Arbitrate Exists**

  1.      <u>Choice of Law</u>

The major dispute between the parties is whether they ever entered into a contract containing an arbitration clause. A federal court normally must "look to state law principles of contract formation to tell [it] whether an agreement to arbitrate has been reached." *Avedon*, 126 F.3d at 1287.

---

[3] The Terlizzis say that their system produces 96% of their "average usage," in contrast to the 110% allegedly promised by Altitude's representative. (*Id.* ¶ 69.)

11

"As this court is sitting in diversity, . . . Colorado choice of law principles must be applied in the present case." *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F. Supp. 1048, 1049 (D. Colo. 1985). Colorado follows the Restatement (Second) of Conflict of Laws for contract claims. *See Wood Bros. Homes v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979). In most cases, the Restatement—and therefore Colorado—will honor a contractual choice-of-law clause. *See* Restatement (Second) of Conflict of Laws § 187(1). The Terms and Conditions contain a choice-of-law clause specifying that the Installment Loan Agreement will be governed by "the laws of the State where the Lender is located as shown on the front of this document." (ECF No. 40-8 at 5, ¶ 16.) The lender specified on the front of the Installment Loan Agreement is "Union Bank and Trust, Richmond, VA." (*Id.* at 4.) Accordingly, Virginia law arguably applies to the present dispute.

GreenSky, however, does not argue that this Court should apply Virginia law to the question of whether a contract was formed. The Court presumes this is because the question before the Court is *whether* the Terms and Conditions—including both the arbitration and choice-of-law clauses—are a part of the parties' contract. On this matter, the Terlizzis cite Colorado law for the governing standards. (*See* ECF No. 40 at 16–17.) GreenSky states no objection to the Terlizzis' approach, and GreenSky itself invokes Colorado law at times. (*See* ECF No. 45 at 8 n.3.) The Court therefore deems it conceded for present purposes that Colorado law governs the question of contract formation.

2. Contract Formation Under Colorado Law

In Colorado, whether the parties entered into a contract is a fact question. *I.M.A.,*

*Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986). "[A] contract is formed when an offer is accepted." *Scoular Co. v. Denney*, 151 P.3d 615, 617 (Colo. App. 2006). Acceptance may be shown "by act or conduct." *Linder v. Midland Oil Ref. Co.*, 40 P.2d 253, 254 (Colo. 1935); *see also* Restatement (Second) of Contracts § 19(1) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."), *cited with approval in Haberl v. Bigelow*, 855 P.2d 1368, 1374 (Colo. 1993). Conduct, in particular, manifests assent if the party in question "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19(2).

3. Application

The only genuine factual dispute on this record is whether the Terlizzis received the Terms and Conditions on or before July 1, 2015. But this is not a *material* factual dispute because later events demonstrate that the Terlizzis assented to the Terms and Conditions.

The undisputed evidence shows that GreenSky mailed the Terms and Conditions to the Terlizzis on July 1, 2015, and the Court finds no reason to reject GreenSky's presumption that the mailing arrived no later than July 6, 2015. At the very least, it would be unreasonable to suggest that the mailing arrived after September 12, 2015— the undisputed date by which the Terlizzis began drawing upon the GreenSky loan.

Thus, *before* drawing on the loan, the Terlizzis received the full text of the contract with GreenSky. They were repeatedly notified—on the first page of the Installment Loan Agreement, which Jason Terlizzi signed; on the Shopping Pass; and

13

on the cover letter of the mailing received sometime before they drew on the loan—that there was no obligation on them until they chose to draw upon the loan, but that drawing upon the loan would constitute acceptance of the Terms and Conditions. Consequently, the Terlizzis "[knew] or ha[d] reason to know that" GreenSky would "infer from [their] conduct [*i.e.*, drawing on the loan] that [they] assent[ed]" to the Terms and Conditions. Restatement (Second) of Contracts § 19(2).[4]

Failure to read the Terms and Conditions is not an excuse under Colorado law. *See Smith v. Whitlow*, 268 P.2d 1031, 1034–35 (Colo. 1954) ("[E]quity will not relieve a party from the ill effects of a contract voluntarily executed . . . where he could have been fully advised by the exercise of reasonable diligence. In the exercise of such due diligence as is required, Smith should have read the contract before signing it . . . ."). And in any event, the portion of the Installment Loan Agreement that the Terlizzis indisputably saw before signing the Agreement warned of an arbitration clause that the Terlizzis could reject. So the Terlizzis' duty of diligence was emphasized all the more.

The Terlizzis cite a number of cases supposedly favoring their position that later-transmitted terms cannot become part of the agreement. (ECF No. 40 at 20–21.) None of these cases actually helps the Terlizzis; some of them favor GreenSky instead.

One of the Terlizzis' cited cases is about the classic law school conundrum of whether terms and conditions transmitted with the *acceptance* of an offer become part

---

[4] The Court recognizes that only Jason Terlizzi signed the relevant documents. But the Terlizzis do not argue that Rebecca Terlizzi may avoid arbitration as a non-signatory. To the contrary, the Terlizzis argue that Rebecca Terlizzi *should* be considered a party to, or at least a beneficiary of, the various agreements at issue. (ECF No. 40 at 27–28.) Accordingly, the Court need not address the effect on arbitrability, if any, of Rebecca Terlizzi's non-signatory status. Furthermore, the Court's references to the Terlizzis' conduct (in the plural) is not meant as a resolution of whether there should be any legal distinction between Jason and Rebecca in further proceedings. It is purely for convenience.

of the agreement. *Flavor House Prods., Inc. v. Int'l Nut All., LLC*, 2012 WL 2339754, at *2 (M.D. Ala. June 19, 2012). That is not relevant here. This dispute is not about terms transmitted by the Terlizzis to GreenSky.

Two of the Terlizzis' cited cases are about whether website visitors are bound by terms of service that they would never likely read unless they noticed and clicked on a particular link (so-called "browsewrap" agreements). *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064–65 (D. Nev. 2012). That situation is also not relevant here.

The remaining cases cited by the Terlizzis present fact scenarios roughly similar to the one at issue, but those cases ultimately support GreenSky because they affirm that acceptance through conduct will create a binding agreement so long as the contract-forming effect of that conduct is known to the party engaging in it. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012) ("where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on *inquiry* notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent" (emphasis in original)); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–30 (2d Cir. 2002) ("a consumer's clicking on a download button does not communicate assent to contractual terms *if the offer did not make clear to the consumer* that clicking on the download button would signify assent to those terms" (emphasis added)); *Grosvenor v. Qwest Commc'ns Int'l, Inc.*, 2010 WL 3906253, at *9 (D. Colo. Sept. 30, 2010) (subscription service welcome letter's reference to the terms contained on a website, and a directive to read those terms and cancel the subscription

15

within 30 days if the terms are not acceptable, can create a binding contract including the terms specified on the website); *cf.* Restatement (Second) of Contracts § 19(2).

Accordingly, there is no genuine, material dispute that the Terlizzis entered into an agreement containing the Terms and Conditions, including the arbitration clause, when they drew upon the GreenSky loan with reason to know that GreenSky would construe that act as assent to the Terms and Conditions.[5]

**B.      Unconscionability**

The Terlizzis alternatively argue that the arbitration clause is unconscionable. (ECF No. 40 at 22–25.)  However, the arbitration clause assigns questions of "validity, enforceability or scope of this Arbitration Provision or the Agreement" to the arbitrator. (ECF No. 40-8 at 6, ¶ 24.)  When such a "delegation clause" exists, a party resisting arbitration on grounds such as unconscionability must specifically direct that argument at the delegation clause; otherwise the argument is for the arbitrator to resolve.  *See Rent-A-Center*, 561 U.S. at 72 ("unless Jackson challenged the delegation provision specifically, we must treat it as valid under [9 U.S.C.] § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator").

The Terlizzis' unconscionability challenge is, in substance, an attack on the entire Terms and Conditions, although it is nominally directed only at the arbitration clause. (*See* ECF No. 40 at 22–25.)  In either event, the Terlizzis do not attack the delegation clause specifically.  The Court is thus constrained by Supreme Court precedent to refer

---

[5] The Terlizzis attempt to avoid the class-action waiver in the Terms and Conditions through the same attack they bring against the arbitration clause, *i.e.*, it is part of the Terms and Conditions which never became part of their agreement with GreenSky. (ECF No. 40 at 22.) For the same reasons just discussed, that argument fails.

16

their unconscionability argument to the arbitrator.

**C.      Stay, not Dismissal**

GreenSky's motion requests dismissal in favor of arbitration, rather than a stay. The FAA directs a stay: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . , the court . . . shall on application of one of the parties *stay* the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3 (emphasis added).  Although the Court understands that some decisions nonetheless order dismissal, the Court is not convinced—at least not on the arguments presented by GreenSky—that a regular practice of dismissing, rather than staying, is appropriate. Thus, proceedings between the Terlizzis and GreenSky will be stayed pending arbitration, assuming the Terlizzis demand arbitration.

The undersigned's typical practice in these situations is to stay *and* administratively close the case.  That course is not currently available here because Altitude remains as a defendant and the Court has granted no motion to compel arbitration in Altitude's favor.  Accordingly, the Court will order the Terlizzis to submit an appropriate filing regarding Altitude (presumably a Rule 41(a) motion to dismiss, a suggestion of bankruptcy, or a motion for default judgment).  Upon receipt of that filing, the Court will determine the best course.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      GreenSky's Motion to Dismiss or, in the Alternative, to Compel Arbitration and Stay Proceedings (ECF No. 86) is GRANTED to the extent the Court finds that

17

this dispute is referable to arbitration, but otherwise DENIED AS MOOT;

2. If the Terlizzis wish to pursue their current claims against GreenSky, they must do so through arbitration as provided for in the Terms and Conditions of the parties' Installment Loan Agreement;

3. All proceedings between the Terlizzis and GreenSky are STAYED;

4. No later than **May 29, 2018**, the Terlizzis shall submit an appropriate filing (such as a Rule 41(a) motion to dismiss, a suggestion of bankruptcy, or a motion for default judgment) addressing Altitude's current status.

Dated this 14th day of May, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge